USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/14/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CATHERINE BARNES and ELIZABETH MENKOWITZ, individually and on behalf of all others similarly situated,

                Plaintiffs,

-against-

KOS, INC.,

                Defendant.

7:23-cv-10104 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

    Plaintiffs Catherine Barnes and Elizabeth Menkowitz (collectively, "Plaintiffs") bring this putative class action, on behalf of themselves and all others similarly situated, against KOS, Inc. ("Defendant") for: (1) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349; (2) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 350; and (3) breach of express warranty. (*See* FAC, ECF No. 14.) Plaintiffs' First Amended Complaint pleads several forms of relief, including damages and injunctive relief. (*Id*. ¶ 78.)

    Defendant moves to dismiss Plaintiffs' First Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Def.'s Mot. to Dismiss, the "Motion," ECF No. 16.) Because the named Plaintiffs have failed to meet their "burden of demonstrating that they have standing," the Court grants the Defendant's Motion and dismisses the First Amended Complaint, without prejudice. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430 (2021). Having determined that the Plaintiffs lack standing, the Court does not reach the merits of their claims.

1

## BACKGROUND

I.  **Factual Background**

The following facts are taken from the First Amended Complaint and assumed to be true for Defendant's Motion.

Plaintiffs allege that Defendant sells plant protein powder (the "Products"), and markets them as "wellness" and "superfood" products that are "nature-powered" and "organic." (FAC ¶ 1.) Catherine Barnes ("Barnes") is a New York resident who purchased Defendant's Chocolate and Vanilla Flavored Product from a Whole Foods store located in Westchester County in May of 2022. (*Id*. ¶ 34.) Elizabeth Menkowitz ("Menkowitz") is a New York resident who purchased Defendant's Vanilla Flavored Product from Amazon in the summer of 2023. (*Id*. ¶ 35.) Plaintiffs relied on Defendant's marketing and advertising when purchasing the Products. (*Id*. ¶¶ 34-35.) Plaintiffs allege that Defendant's Products contain "dangerously high levels of PFAS" based on independent testing performed in or around March, April, and June 2023, by three laboratories in Charleston, South Carolina, and San Diego, California. (*Id*. ¶¶ 2, 4.) Plaintiffs allege that "[t]he analytical methods used were EPA 537.1 Modified and EPA Method 1633." (*Id*. ¶ 4.) Menkowitz alleges that the Product she partially consumed — without incident — was tested by an independent lab and confirmed the presence of PFOA at .369 ng/g, consistent with other independent results. (*Id*. ¶ 36.) Plaintiffs allege economic injury because the Products are sold at a price premium and are "worth less than what they bargained and/or paid for." (*Id*. ¶¶ 29, 58.) According to Plaintiffs, had they known the Products contained PFAS, they "would not have purchased the Products, or at the very least, would have only been willing to pay significantly less" (*Id*. ¶¶ 34-35.) Plaintiffs allege that "PFAS chemicals are all dangerous to human health if ingested, even at very low levels." (*Id*. ¶ 4.) They concede to the "presence of PFAS in food and drinks" and allege — relying on certain EPA drinking water standards — that "even tiny amounts of PFAS in things people drink, over time, accumulate to dangerous levels." (*Id*. ¶¶ 14, 17.) Plaintiffs allege that "[n]o reasonable consumer

would expect that a product marketed for one's health would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans." (*Id*. ¶ 28.)

Based on the foregoing facts, Plaintiffs bring the following claims: (1) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349; (2) violation of New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 350; and (3) breach of express warranty.

## II.    Procedural Background

On November 16, 2023, Plaintiffs filed the original Complaint against Defendant. (ECF No. 1.) Defendant sought leave to file a motion to dismiss the original Complaint on April 12, 2024, of which the Court granted. (ECF No. 11.) On June 5, 2024, Plaintiffs sought leave to file the First Amended Complaint. (ECF No. 12.) The Court granted Plaintiffs' request on June 5, 2024. (ECF No. 13.) On June 26, 2024, Plaintiffs filed the First Amended Complaint, amending their original Complaint against Defendant, with jury demand. (ECF No. 14.)

On October 1, 2024, Defendant filed the Motion, seeking dismissal for lack of Article III standing pursuant to Federal Rules of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to 12(b)(6). (ECF No. 16.) Defendants also filed a supplemental Memorandum of Law (Def. 's Suppl. Mem. of L. in Supp. of Def.'s Mot. "Def. 's Mem. of L.", ECF No. 16) and reply (Def.'s Reply in Supp. of Def.'s Mot., "Def. 's Reply", ECF No. 18), in support thereof. On October 1, 2024, Plaintiff filed an Opposition and Memorandum of Law to the Defendants' Motion (Pls.' Mem. in Opp'n to Def.'s Mot., "Pls' Opp'n", ECF No. 17).

## LEGAL STANDARD

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") provides in relevant part, that a case is properly dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. When resolving a Rule 12(b)(1) motion for lack of lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings. *See Kamen v. American Tel.*

3

*& Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). Plaintiff bears the burden of demonstrating by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).

**B.    Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

**I.    Article III Standing**

A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and is properly brought under Fed. R. Civ. P. 12(b)(1). *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d

34, 44 (2d Cir. 2015) (standing is "threshold matter" in determining district court's jurisdiction to hear the case). In the class action context, plaintiffs, as the collective party invoking federal jurisdiction, "bear the burden of demonstrating that they have standing." *Hicks v. L'Oreal U.S.A., Inc.*, No. 22 CIV. 1989 (JPC), 2024 WL 4252498, at *8 (S.D.N.Y. Sept. 19, 2024) (quoting *TransUnion*, 594 U.S. at 423). When determining a motion to dismiss an action for lack of subject matter jurisdiction, the Court must accept all factual allegations pled in the complaint as true. *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

When faced with a motion asserting a combination of Rule 12(b) defenses, as Defendant does in the instant action, the Court must first resolve any jurisdictional challenges, such as whether Plaintiffs have standing, before addressing whether the Complaint sufficiently states a claim. *Lurenz v. Coca-Cola Co.*, No. 22 CIV. 10941 (NSR), 2024 WL 2943834, at *2 (S.D.N.Y. June 10, 2024) (quoting *Hernandez v. Wonderful Co. LLC*, No. 23-CV-1242 (ER), 2023 WL 9022844, at *4 (S.D.N.Y. Dec. 29, 2023)).

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) redressability of the injury by a "favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 560. In a potential class action, the named class plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). To establish an injury for Article III standing, parties might successfully allege an economic injury through a theory of price-premium injury or through benefit-of-bargain theory. *See In re Beech-Nut Nutrition Co. Baby Food Litig.*, No. 1:21-CV-133, 2025 WL 862382, at *4 (N.D.N.Y. Mar. 19, 2025). The Court addresses both theories of injury in turn.

## II. Price-Premium Injury

First, Plaintiffs allege they have suffered an economic injury under a price-premium theory. (FAC ¶¶ 29-30.) To establish an economic injury under a price-premium theory, a plaintiff must allege that "[they] purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result." *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 703-04 (2d Cir. 2020). The Second Circuit has broadly accepted the price-premium theory of injury. *Lurenz*, 2024 WL 2943834, at *2. Plaintiffs still must "plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018). In the current case, the Plaintiff must "plausibly allege that [they] purchased a Product that was misbranded, i.e., that contained PFAS." *Lurenz*, 2024 WL 2943834, at *3. "While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003).

Plaintiffs, in asserting injury pursuant to a price-premium theory, contend that had the "Defendant disclosed on the label that the Product contained PFAS chemicals, and the harms that can result from ingesting PFAS chemicals," they "would not have purchased the Products, or at the very least, would have only been willing to pay significantly less." (FAC ¶¶ 34-35.) The Court finds Plaintiffs' allegations unavailing.

### A. Plaintiffs Do Not Plausibly Allege That They Purchased Products Containing PFAS.

The Court finds that Plaintiffs lack injury-in-fact as needed for Article III standing under the price-premium. Plaintiffs do not plausibly allege that their Product was misbranded, i.e., that it contained PFAS. Plaintiffs must plead that they "either purchased adulterated products or that PFAS was so widespread that it was plausible that either specific product lines or all of the defendant's products contained PFAS." *Lurenz*, 2024 WL 2943834, at *3. Here, where Plaintiffs rely on testing to support allegations of misbranding, "[t]he most direct route would be for Plaintiffs to test their own purchases

6

for PFAS." *Onaka v. Shiseido Ams. Corp.*, No. 21 Civ. 10665 (PAC), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024). Plaintiffs do not so establish a direct route as they only offer insufficient detail regarding their alleged testing. *See Dunning v. Supergoop, LLC*, No. 23 CIV.11242 (JPC), 2025 WL 34822, at *4 (S.D.N.Y. Jan. 6, 2025) (holding that plaintiffs who alleged "on some unspecified date, they conducted testing" in accordance with regulations on their purchased sunscreen, failed to plausibly allege injury-in-fact without providing additional detail of what testing entailed).

Here, Plaintiffs attempt to assert standing under a price-premium theory by way of alleging that Menkowitz tested "[t]he Product [she] purchased and partially consumed," and "confirmed the presence of PFOA in an amount of .369 ng/g." (FAC ¶ 36.) Plaintiffs contend that this takes "[t]he most direct route" and shows that the Product she purchased was misbranded as it "definitely" contained PFAS. (Pls.' Opp'n at 3-4.) As stated in Defendant's Reply, "*Onaka* does not abandon the well-established principle that a proffered lab analysis is worthless where the plaintiff does not substantiate the facts supporting that lab testing." (Def.'s Reply at 3.) Here, Plaintiffs do not aver any facts supporting Menkowitz's test. (*See generally* FAC.) Like in *Dunning*, Menkowitz conducted testing on an unspecified date. (*Id.* ¶ 36.) Menkowitz does not clarify whether her purchase preceded the test — only stating that it was made "sometime in summer 2023." (*Id.* ¶ 35.) Unlike *Dunning*, where the plaintiff conducted testing in accordance with specified regulations, here, Menkowitz does not mention any facts about what the testing even entailed. (*Id.*) She pleads no information as to the testing methodology, the date or place of the testing, who conducted the testing, or what the exact component of the product was tested. (*Id.*) Absent specific facts concerning Menkowitz's alleged test, "the Court cannot conclude that the presence of PFAS in [the Product] that Plaintiff [] purchased was anything more than a 'sheer possibility'" *Lurenz*, 2024 WL 2943834 at *3 (citing *Esquibel v. Colgate-Palmolive Co.*, No. 23-CV-00742-LTS, 2023 WL 7412169, at *2 (S.D.N.Y. Nov. 9, 2023). As they stand, Menkowitz's "sparse factual allegations" make it "equally plausible that the single test result was a false positive" or that it

7

"was the result of an isolated incident of contamination," and, by extension, fail to aver the presence of PFAS in the Defendant's Product as needed for Article III standing. *Id.*

### B. Plaintiffs Do Not Plausibly Allege a Material Link Between Their Purchase and The Independent Test.

Since Plaintiffs cannot take the most direct route — test the actual product they purchased — to establish Article III standing under the price-premium theory, they may still attempt to allege the presence of PFAS "provided [they] sufficiently link [] the results of independent testing of the same product line to the product actually purchased" *Hicks v. L'Oreal U.S.A., Inc.* ("Hicks II"), No. 22 Civ. 1989 (JPC), 22 Civ. 3926 (JPC), 2024 WL 4252498, at *9 (S.D.N.Y. Sept. 19, 2024). To provide a sufficient link, Plaintiffs must allege facts "from which the Court could extrapolate that their isolated testing should apply broadly to Defendant's Products." *Onaka v. Shiseido Americas Corp.*, No. 21-CV-10665-PAC, 2023 WL 2663877, at *3 (S.D.N.Y. Mar. 28, 2023).

The Court considers a variety of factors to determine whether a meaningful link exists between the results of testing and a plaintiff's actual purchases to permit a plausible inference of injury. At a minimum, Plaintiffs must establish the test occurred "reasonably near in time" to their purchases. *Clinger v. Edgewell Personal Care Brands, LLC*, No. 21 Civ. 1040, 2023 WL 2477499, at *4 (D. Conn. Mar. 13, 2023); *See also Onaka*, 2024 WL 1177976, at *3 (finding no injury absent information about "when exactly [Plaintiff] purchased each particular [product]" even though plaintiffs alleged purchase occurred "in September 2021" and the testing took place in "September or October of 2021"). The Court will look to whether a plaintiff "regularly purchased" the product and whether they alleged facts that such product was "systematically and routinely mislabeled." *See John v. Whole Foods Mkt. Grp., Inc.,* 858 F.3d 732, 735-737 (2d Cir. 2017) (holding that the plaintiff plausibly alleged injury based on regular monthly purchases at two named locations during the same period a state investigation found systematic overcharging occurred nearly 90% of the time). The Court will also consider "geographic proximity" of

the products tested to the Products purchased and whether Plaintiffs have established that the products were manufactured uniformly across locations. *See Dunning*, 2025 WL 34822, at *5.

Plaintiffs fail to sufficiently link the results of their third-party test to their purchased Products. First, the third-party testing is not reasonably near in time to when Plaintiffs made their purchases. In fact, Plaintiffs' purchases are more remote than in *Onaka*, where the plaintiff's purchase occurred within the same month as, or approximately one month before, the testing. Here, the testing was conducted at an unspecified time, in or around March, April, and June 2023. (FAC ¶ 4.) Barnes made a single purchase of two of Defendant's Products in May 2022 — over a year before the alleged testing. (*Id*. ¶ 34.) Like in *Onaka*, Menkowitz does not specify the exact date of her purchase, only that it was made sometime in summer of 2023. (*Id*. ¶ 35.) Because Plaintiffs' testing allegations are temporally remote, they fail to establish a sufficient link between their purchased Products and the third-party test.

Next, Plaintiffs do not allege facts from which the Court could find that their isolated third-party test should apply generally to all of Defendant's because Plaintiffs did not regularly purchase the Products, nor do they allege that the Products were systematically and routinely mislabeled. (*See generally* FAC.) Unlike *John*, where the plaintiff made regular, repeated purchases at the same two retailers, Plaintiffs purchased their respective Products on two isolated instances from two different retailers. (*Id*. ¶¶ 34-35.) Furthermore, unlike *John*, where the plaintiff included an investigation to his complaint, Plaintiffs do not allege any sources showing Defendant's Products were systematically contaminated. (*See generally* FAC.) Instead, they rely only on conclusory allegations that "all of Defendant's Products contain dangerously high levels of PFAS." (*Id*. ¶ 34.) Plaintiffs fail to allege that they paid a premium price because they do not show how the testing results apply broadly to Defendant's Products such that their purchased Products contained PFAS.

Finally, Plaintiffs plead insufficient facts as to the geographic proximity between their Products and the alleged testing. They allege that three "qualified laboratories" across the country, in South Carolina and San Diego, performed "EPA 537.1 Modified and EPA Method 1633" on the tested

9

products. (*Id.* ¶ 4.) Yet, both Plaintiffs are residents of New York. (*Id.* ¶¶ 34-35.) Barnes purchased the Product in New York and Menkowitz purchased the Product on Amazon. (*Id.*) Plaintiffs do not allege that Defendant's "Products were produced in a consistent manner through a standardized manufacturing process" to excuse the lack of geographic proximity. *See Dunning*, 2025 WL 34822, at *5 (citing *Hicks II*, 2024 WL 894965, at *11). Plaintiffs do not provide identifying information — such as SKU numbers or lot codes — that would indicate where the tested products were purchased or obtained. (Def.'s Reply at 4.) There is no support from, or even identification of, the researcher who conducted the EPA analysis. (FAC. ¶ 4). There is no indication as to whether multiple or repeat tests were conducted. (*Id.*) Plaintiffs thus omit key details necessary to establish a geographic connection between their purchased Products and the independent third-party testing so that they can sufficiently allege the presence of PFAS in their Product. By extension, Plaintiffs do not plausibly allege facts from which the Court could reasonably extrapolate that the independent testing applies broadly to the Products they purchased, let alone "all consumers who purchased the Products within the United States" or "in New York," (FAC. ¶ 38.) Because Plaintiffs fail to establish a meaningful link between the geographically limited test results and the specific Products they purchased, the Court cannot reasonably infer that Plaintiffs purchased misbranded Products or that PFAS was so widespread as to plausibly affect specific product lines or all Defendant's products. In the absence of such allegations, "[t]he Amended Complaint's allegations boil down to describing general and unspecific results of testing" insufficient to sustain Article III standing. *See Hicks*, 2023 WL 6386847, at *9. Therefore, Plaintiffs are unable to demonstrate they suffered injury pursuant to a price-premium theory as needed to sustain Article III standing.

### III.   Benefit of the Bargain Injury

Having concluded Plaintiffs' price-premium theory of injury cannot satisfy the Article III standing threshold, the Court turns now to Plaintiffs' argument that they suffered an economic injury under the benefit of the bargain theory. (FAC ¶¶ 58-59.) Under the benefit of the bargain theory, "a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth

10

a given value but received a product worth less than that value." *In re Beech-Nut Nutrition Co. Baby Food Litig.*, 2025 WL 862382, at *4 (quoting *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liability Litigation*, 903 F.3d 278, 283 (3d Cir. 2018)). Plaintiffs must identify the specific misrepresentations that induced purchase. *Id.*

    **A. Plaintiffs Do Not Plausibly Allege How The Presence of PFAS Render Their Product Worth Less Than What They Bargained For.**

The Second Circuit has recently applied the more stringent Third Circuit standard for benefit of the bargain theory. In *In re Beech-Nut Nutrition Company Baby Food Litigation,* a case involving substantially similar facts as here, the court rejected plaintiffs' benefit of the bargain theory as a basis for Article III standing because they did not allege an injury that was either concrete or particularized. *Id.* at *5. Therein, the plaintiffs alleged that defendants branded their products (baby food) as "organic," "natural," "USDA-Certified Organic," "real food for babies," "nothing artificial added," "non-GMO," and "free from artificial preservatives, colors, and flavors." *Id*. Crucially, the *In re Beech-Nut* court found that the plaintiffs did not show that the defendant's products was worth something less than safe and usable baby food. *Id.* at *4. Plaintiffs paid for safe and healthy baby food. *Id.* at *5. They did not allege how the presence of heavy metals specifically rendered defendant's representations false or misleading. *Id*. Nor did they specifically "plea[d] that the goods failed to serve their intended purpose" which ultimately undermined their claim. *Id*. The *In re Beech-Nut* court noted that the plaintiffs' allegations –– that the baby foods they purchased contained "unsatisfactory levels of heavy metals" — impermissibly asked the court to infer that the mere presence of heavy metals rendered the food unsafe, unusable, and therefore, worthless. *Id*. Accordingly, the Second Circuit found this to be insufficient, stating that such allegations, made in a "conclusory manner" did not constitute an injury that was "either concrete or particularized" *Id*.

    In the instant action the Plaintiffs offer the same conclusory arguments that were dismissed in *In re Beech-Nut Nutrition Company Baby Food Litigation*. Like in *In re Beech-Nut*, where plaintiffs alleged

11

that the defendants branded their food as "organic," and "natural" "real food for babies," Plaintiffs allege that Defendant marketed and advertised the Product as "wellness" and "superfood" products that are "nature-powered," and "organic." (FAC ¶ 1.) As in *In Re Beech-Nut,* Plaintiffs fail to allege that the Products are worth something less than advertised. (*See generally* FAC.) They paid for and received protein powder. (*Id*. ¶¶ 34-35.) Like the claims in *In re Beech-Nut*, Plaintiffs' assertion that "[n]o reasonable consumer would expect that a product marketed for one's health would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans" is purely conclusory. (*Id.* ¶ 28.) Similarly to where the *In re Beech-Nut* plaintiffs alleged the presence of heavy metals and asked the court to infer injury, Plaintiffs here rely on broad claims of "dangerously high levels of PFAS" without any factual support. (*Id*. ¶¶ 2, 34, 75.) Indeed, they acknowledge the widespread "presence of PFAS in food and drinks" and rely on generalized statements about drinking water standards to argue that "even tiny amounts of PFAS in things people drink, over time, accumulate to dangerous levels." (*Id*. ¶¶ 14, 17.) These allegations underscore Plaintiffs inability to plead specific facts supporting actual harm. Also like in *In re-Beech-Nut*, Plaintiffs do not plead facts as to how the Products failed to serve its intended purpose. (*See generally* FAC.) Barnes did not even consume the product, and Menkowitz (the only Plaintiff who allegedly consumed the product) apparently "consumed it without incident." (Def.'s Mem. of L. at 2.) Because Plaintiffs cannot show how the Products were "worth less than what they bargained and/or paid for" they fail to establish a concrete and particularized injury. (FAC ¶ 58.)

For the foregoing reasons, the Court concludes that Plaintiffs fail to "plead sufficient facts to make it plausible that [she] did indeed suffer the sort of injury that would entitle [them] to relief." *Lurenz*, 2024 WL 2943834, at *4 (internal quotation marks omitted). Accordingly, Plaintiffs price-premium injury rests on conclusory allegations that are insufficient to sustain Article III standing. Because Plaintiffs cannot demonstrate Article III standing under a price premium theory nor under a benefit of the bargain theory, the Court must dismiss Plaintiffs' First Amended Complaint in its entirety, without prejudice.

IV.     **Leave to Amend**

Lastly, the Court considers whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court" to deny leave to amend "for good reason," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (quoting Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018)), including "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Still, there is a particularly strong preference for allowing amendment when "the plaintiff has not had the benefit of a court ruling with respect to the deficiencies of its pleading." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 473 F. Supp. 3d 361, 365 (S.D.N.Y. 2020); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs.*, LLC, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Although Plaintiff have sought leave to amend their complaint once (*see* ECF No. 12), "Plaintiff [ ] did not previously have the benefit of a Court ruling putting [him] on notice of these deficiencies." *See Esquibel*, 2023 WL 7412169, at *4. The Court will grant Plaintiffs leave to file a second amended complaint.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss the Amended Complaint is GRANTED.

Plaintiffs are granted leave to file a Second Amended Complaint. If Plaintiffs choose to do so, Plaintiffs will have until August 29, 2025, to file a Second Amended Complaint. Plaintiffs are advised that the Second Amended Complaint will replace, not supplement, the Amended Complaint, and so any claims that they wish to pursue must be included in, or attached to, the Second Amended Complaint.

Should Plaintiffs file a Second Amended Complaint, the Defendant is directed to answer or otherwise respond by September 29, 2025.

If Plaintiffs fail to file a Second Amended Complaint within the time allowed, and they cannot show good cause to excuse such failure, any claims dismissed without prejudice by this Order will be deemed dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 16.

Dated:   July 14, 2025                                       SO ORDERED:
         White Plains, New York

                                                                                    NELSON S. ROMÁN
                                                                       United States District Judge